O

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KATHY SHAW, individually and on behalf of other members of the public similarly situated; HARTWELL STEELE, individually and on behalf of other members of the public similarly situated, | ) ) ) ) ) ) ) ) | Case No. CV 16-4372 DDP (RAOx)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>[Dkt. 20] |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| NISSAN NORTH AMERICA, INC., a California corporation; NISSAN JIDOSHA KABUSHIKI KAISHA, a publicly traded company in Japan doing business as Nissan Motor Co., Ltd., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

Before the court is Defendant Nissan North America, Inc.'s Motion to Dismiss Plaintiffs Kathy Shaw and Hartwell Steele's Complaint. (Dkt. 20.) Having reviewed the parties' submissions and heard oral argument, the court adopts the following Order.

//

## I. BACKGROUND

This putative consumer class action arises out of allegations that Defendants Nissan North America, Inc. ("NNA") and Nissan Jidosha Kabushiki d/b/a Nissan Moto Co., Ltd.'s ("Nissan Japan") (collectively "Nissan") operated a Racketeer Influenced and Corrupt Organization Act ("RICO") enterprise along with their supplier BorgWarner, Inc. ("BorgWarner"). (Compl. ¶ 1.) The pertinent facts, which the court assumes as true for purposes of this motion, are as follows.

NNA, along with its parent company Nissan Japan, designs, manufactures, sells, and maintains consumer automobiles. (Id. ¶¶ 19-21.) Among the vehicles Nissan produces are the: 2004 – 2008 Nissan Maxima vehicles, 2004 – 2009 Nissan Quest vehicles, 2004 – 2006 Nissan Altima vehicles (with the VQ35 engine), 2005 – 2007 Nissan Pathfinder vehicles, 2005 – 2007 Nissan Xterra vehicles, and 2005 – 2007 Nissan Frontier vehicles (with the VQ40 engine) (collectively "Subject Nissan Vehicles"). (Id. ¶ 2.) These vehicles are relevant to the present action because each of them contains an allegedly faulty timing chain tensioning system (TSTS). (Id.)

By way of background, the TCTS is component of a functioning internal combustion engine. (Id. ¶ 30.) As the Complaint succinctly explains:

> It is responsible for connecting the engine's camshaft to the crankshaft, which in turn control the opening and closing of the engine's valves. These activities must occur at certain, specific time intervals. In particular, proper engine functioning requires that the valves open and close in a precise synchronized manner, which is coordinated with the up and down movement of the pistons. The timing chain system, including the Timing Chain Tensioning System is responsible for ensuring that this occurs.

1   (Id.) When the TCTS begins to fail, it damages the engine and leads

2   to increased vehicle emissions and worsening fuel economy. (Id. ¶

3   32.) If left unfixed, vehicles may have difficulty accelerating,

4   maintaining speed, or idling smoothly, and the engine will

5   ultimately fail. (Id.) In a worst case scenario, the TCTS might

6   fail while a vehicle is traveling at highway speeds causing the

7   vehicle to lose speed and possibly be rear-ended or cause some

8   other safety risk. (Id. ¶¶ 10, 35.)

9       According to Plaintiffs, Nissan manufactured the Subject

10  Nissan Vehicles knowing that there was a faulty TCTS and failed to

11  disclose that problem to consumers. (Id. ¶ 42.) While a consumer

12  might reasonably expect a TCTS to last more than ten years, the

13  Nissan TCTSs were subject to failure earlier, which led to safety

14  hazards and unexpected expenses for consumers who were forced to

15  either repair the faulty system or sell their vehicle without

16  repair at a substantial loss. (Id. ¶¶ 9, 10.) Two of these faulty

17  Subject Nissan Vehicles were purchased by Plaintiffs in this

18  action, Kathy Shaw and Hartwell Steele. (Id. ¶¶ 64-76.)

19  Specifically, Ms. Shaw purchased a new 2007 Nissan Pathfinder,

20  which required a TCTS repair by 2015, and Mr. Steele purchased a

21  used 2005 Nissan Xterra, which failed in 2015 while he was driving

22  on the highway. (Id.)

23      Plaintiffs are not the only ones to have purchased Nissan

24  vehicles with faulty TCTSs. Nissan is currently involved in a

25  separate consumer class action, also pending before this Court,

26  which asserts claims for violations of various consumer protection

27  statutes, fraud, and unjust enrichment on the basis of

28  substantially similar facts. See Falco v. Nissan N. Am. Inc., No.

CV 13-00686 DDP (MANx), 2013 WL 5575065, at *2 (C.D. Cal. Oct. 10, 2013). Plaintiffs here, however, rely on a different cause of action and bring this suit for alleged violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

According to Plaintiffs, by 2003, Nissan had learned of the defect in the TCTS. (Compl. ¶ 39.) By then, BorgWarner, the company that manufactured and supplied Nissan with the TCTS at issue here, had also learned of the defect. (Id. ¶¶ 40-41.) Each company conducted their own testing to confirm the nature of the defect and shared those results with each other. (Id. ¶ 41.) Plaintiffs further allege that Nissan's knowledge of the defect can be inferred from both the Technical Service Bulletins ("TSBs") the company issued to its dealerships beginning in 2007, which instructed dealers to repair certain TCTS components, (Id. ¶ 51), and from the fact that Nissan had actually redesigned a component of the TCTS in 2006 or 2007.

Rather than communicate the TCTS defect to consumers, Plaintiffs allege that Nissan and BorgWarner instead formed an "association-in-fact enterprise," which Plaintiffs refer to as the Timing Chain Tensioning System Defect Enterprise ("Defect Enterprise"). (Id. ¶ 104.) The "common purpose" of the Defect Enterprise was "to design, manufacture, distribute, test, and sell Subject Nissan Vehicles equipped with the defective [TCTS] to Plaintiffs and other members of the Class, and thereby maximize the revenue and profitability." (Id. ¶ 108.) At the same time, the Defect Enterprise agreed to "conceal the scope and nature of the [TCTS] defects" in order to continue profiting and avoid incurring

1   any expenses associated with repairing the defect, recalling the

2   product, or addressing investigations by federal regulators. (Id. ¶

3   110.) While the specifics of these communications remain somewhat

4   unclear, Plaintiffs allege that conspiracy was coordinated by mail

5   or wire, in violation of federal mail and wire fraud statutes.

6   Plaintiffs also allege that the issuance of the TSBs were part of

7   the effort to continue concealing the defect from consumers. (Id.

8   ¶¶ 112-13.)

9   **II. LEGAL STANDARD**

10      A complaint will survive a motion to dismiss when it contains

11   "sufficient factual matter, accepted as true, to state a claim to

12   relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S.

13   662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,

14   570 (2007)). When considering a Rule 12(b)(6) motion, a court must

15   "accept as true all allegations of material fact and must construe

16   those facts in the light most favorable to the plaintiff." Resnick

17   v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000). Although a complaint

18   need not include "detailed factual allegations," it must offer

19   "more than an unadorned, the-defendant-unlawfully-harmed-me

20   accusation." Iqbal, 556 U.S. at 678. Conclusory allegations or

21   allegations that are no more than a statement of a legal conclusion

22   "are not entitled to the assumption of truth." Id. at 679. In other

23   words, a pleading that merely offers "labels and conclusions," a

24   "formulaic recitation of the elements," or "naked assertions" will

25   not be sufficient to state a claim upon which relief can be

26   granted. Id. at 678 (citations and internal quotation marks

27   omitted).

28

1   "When there are well-pleaded factual allegations, a court should
2   assume their veracity and then determine whether they plausibly
3   give rise to an entitlement of relief." Id. at 679. Plaintiff must
4   allege "plausible grounds to infer" that their claims rise "above
5   the speculative level." Twombly, 550 U.S. at 555. "Determining
6   whether a complaint states a plausible claim for relief" is a
7   "context-specific task that requires the reviewing court to draw on
8   its judicial experience and common sense." Iqbal, 556 U.S. at 679.

9   **III. DISCUSSION**

10   The gravamen of Plaintiffs' Complaint is that Defendants NNA
11   and Nissan Japan, along with their supplier BorgWarner, acted to
12   conceal a product defect in Subject Nissan Vehicles from consumers
13   and, in doing so, caused economic injury to Plaintiffs. There is
14   also currently pending before this Court a separate consumer class
15   action, claiming violations of various consumer protection
16   statutes, fraud, and unjust enrichment, on nearly identical
17   grounds. See Falco, 2013 WL 5575065, at *2.[1] Plaintiffs bring the
18   present action, however, to assert a new claim under the Racketeer
19   Influenced and Corrupt Organizations ("RICO") Act. Specifically,
20   Plaintiffs allege that the Nissan Defendants have acted in
21   violation of 18 U.S.C. § 1962(c), which makes it "unlawful for any
22   person employed by or associated with any enterprise . . . to
23   conduct or participate, directly or indirectly, in the conduct of
24
25

---

26   [1] Both parties urge the court to take judicial notice of the
     Complaint filed in the related Falco litigation. (See Mot. Dismiss
27   3 n.2; Opp'n Mot. Dismiss 16-17.) As courts can typically take
     notice of the contents and legal effects of public records, the
28   court takes notice of the Falco Complaint. See MGIC Indem. Corp. v.
     Weisman, 803 F.2d 500, 504 (9th Cir. 1986) .

such enterprise's affairs through a pattern of racketeering

activity," and 18 U.S.C. § 1962(d), which makes it unlawful to

conspire to violate § 1962(c). The question before this Court is

whether Plaintiffs have alleged sufficient facts to state a claim

under RICO.

**A. Requirements for Stating a Claim under Civil RICO**

RICO provides for both criminal and civil liability for acts

of criminal organizations. <u>See</u> <u>Odom v. Microsoft Corp.</u>, 486 F.3d

541, 545 (9th Cir. 2007); 18 U.S.C. § 1961, <u>et seq.</u> The Supreme

Court has stated RICO should "be liberally construed to effectuate

its remedial purposes." <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S.

479, 498 (1985). To state a RICO claim under § 1962, a plaintiff

must allege "(1) conduct (2) of an enterprise (3) through a pattern

(4) of racketeering activity." <u>Sedima</u>, 473 U.S. at 496. An

"enterprise" includes "any individual, partnership, corporation,

association, or other legal entity, and any union or group of

individuals associated in fact although not a legal entity." 18

U.S.C. § 1961(4). "Racketeering activity" includes "any act

indictable under" any of a list of dozens of criminal statutes. 18

U.S.C. § 1961(1). A "pattern" "requires the commission of at least

two acts of racketeering activity" within a ten-year period. 18

U.S.C. § 1961(5). Although two predicate acts are needed for a

pattern, "[t]he Supreme Court has concluded that Congress had a

'fairly flexible concept of a pattern in mind.'" <u>United States v.</u>

<u>Freeman</u>, 6 F.3d 586, 596 (9th Cir. 1993) (quoting <u>H.J., Inc. v.</u>

<u>Northwestern Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989)). A plaintiff,

however, "must show that the racketeering predicates are related,

*and* that they amount to or pose an [implicit or explicit] threat of

1  continued criminal activity." <u>H.J.</u>, 492 U.S. at 239 (emphasis in
2  original).

3      Additionally, "[c]ausation lies at the heart of a civil RICO
4  claim." <u>Poulos v. Caesars World, Inc.</u>, 379 F.3d 654, 664 (9th Cir.
5  2004). "[A] plaintiff must show not only that the defendant's
6  violation was a 'but for' cause of his injury, but that it was the
7  proximate cause as well." <u>Forsyth</u>, 114 F.3d at 1481. "This requires
8  a showing of a direct relationship between the injurious conduct
9  alleged and the injury asserted" and "a concrete financial loss."
10 <u>Id.</u>

11     Where, as here, the racketeering activity alleged is fraud,
12 including mail fraud, <u>see</u> 18 U.S.C. § 1341, and wire fraud, <u>see</u> 18
13 U.S.C. § 1343), the heightened pleading requirements of Rule 9(b)
14 apply to the predicate acts. <u>See Moore v. Kayport Package Express</u>,
15 885 F.2d 531 (9th Cir. 1989). Allegations of fraud must be
16 "specific enough to give defendants notice of the particular
17 misconduct," thereby enabling them to "defend against the charge
18 and not just deny that they have done anything wrong." <u>Vess v.</u>
19 <u>Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal
20 quotation marks and citations omitted). Therefore, averments of
21 fraud "must be accompanied by 'the who, what, when, where, and how'
22 of the misconduct charged." <u>Id.</u> (quoting <u>Cooper v. Pickett</u>, 137
23 F.3d 616, 627 (9th Cir. 1997)). In the RICO context, a Plaintiff
24 must "detail with particularity the time, place, and manner of each
25 act of fraud, plus the role of each defendant in each scheme."
26 <u>Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.</u>, 940 F.2d 397,
27 405 (9th Cir. 1991). "A plaintiff may not simply lump together
28 multiple defendants without specifying the role of each defendant

1  in the fraud." <u>In re Toyota Motor Corp. Unintended Acceleration</u>

2  <u>Mktg., Sales Practices, & Prod. Liab. Litig.</u>, 826 F. Supp. 2d 1180,

3  1201 (C.D. Cal. 2011) (citing <u>Swartz v. KPMG LLP</u>, 476 F.3d 756, 764

4  (9th Cir. 2007)).

5

6  **B. Existence of an Enterprise**

7      As a threshold matter, 18 U.S.C. § 1962(c)requires that the

8  Defendant be employed by or associated with an "enterprise." An

9  enterprise is a distinct entity from the Defendant, and cannot be

10 "simply the same 'person' referred to by a different name." <u>Cedric</u>

11 <u>Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158 (2001). Under RICO,

12 two types of associations meet the definition of "enterprise": "The

13 first encompasses organizations such as corporations and

14 partnerships, and other 'legal entities.' The second covers 'any

15 union or group of individuals associated in fact although not a

16 legal entity.'" <u>United States v. Turkette</u>, 452 U.S. 576, 581–82

17 (1981) (citing 18 U.S.C. § 1961(4)). In this case, Plaintiffs claim

18 that Defendants participated in an "associated-in-fact enterprise."

19     An "association-in-fact enterprise is 'a group of persons

20 associated together for a common purpose of engaging in a course of

21 conduct.'" <u>Boyle v. U.S.</u>, 556 U.S. 938, 946 (2009). "Such an

22 enterprise . . . is proved by evidence of an ongoing organization,

23 formal or informal, and by evidence that the various associates

24 function as a continuing unit." <u>Id.</u> at 945. "An association-in-fact

25 enterprise must have at least three structural features: a purpose,

26 relationships among those associated with the enterprise, and

27 longevity sufficient to permit these associates to pursue the

28 enterprise's purpose." <u>Id.</u>

1   Defendants argue that the Complaint must be dismissed at the
2   outset for failure to plausibly allege the existence of an
3   "enterprise." Specifically, Defendants contend that whatever
4   association existed between NNA, Nissan Japan, and BorgWarner
5   lacked the required "common purpose" and failed to meet the
6   "distinctiveness" requirement.

7   **1. Common Purpose**

8   Before addressing the parties contentions regarding common
9   purpose, the court notes that, in the Ninth Circuit, "the law is
10  unsettled as to whether the common purpose must be fraudulent."
11  Chagby v. Target Corp., No. CV 08-4425-GKH(PJWX), 2008 WL 5686105,
12  at *2 (C.D. Cal. Oct. 27, 2008) aff'd, 358 Fed. Appx. 805 (9th Cir.
13  2009). In at least one other circuit, RICO liability will only lie
14  where there is a finding of fraudulent common purpose. See First
15  Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 174 (2d
16  Cir. 2004). But as the well-reasoned opinion of a fellow district
17  court notes, a number of cases in our circuit have concluded that a
18  fraudulent common purpose establishes RICO liability without
19  explaining whether the fraudulent aspect was necessary to the
20  determination. Gomez v. Guthy-Renker, LLC, No. EDCV 14-01425 JGB
21  (KKx), 2015 WL 4270042, at *9 (C.D. Cal. July 13, 2015). And at
22  least one court has permitted a RICO claim to proceed where the
23  common purpose was the benign goal of "simply effectuat[ing] EFT
24  payments." Friedman v. 24 Hour Fitness USA, Inc., 580 F. Supp. 2d
25  985 (C.D. Cal. 2008). However, "[c]ourts have overwhelmingly
26  rejected attempts to characterize routine commercial relationships
27  as RICO enterprises." Gomez, 2015 WL 4270042, at *8. In evaluating
28  the parties' competing arguments regarding the existence of a

common purpose, the court will not require an allegation of fraudulent common purpose but is mindful of the guidance that entities engaged in "ordinary business conduct and an ordinary business purpose" do not necessarily constitute an "enterprise" bound by common purpose under RICO. See In re Jamster Mktg. Litig., No. 05cv-0819 JM (CAB), 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009).

Defendants contend that the allegations in the Complaint fail to plausibly allege any common purpose. The Complaint makes only two explicit references to a common purpose. First, the opening paragraph states that NNA, Nissan Japan, and BorgWarner participated in an enterprise, "which was formed for the purpose of concealing the scope and nature of the [TCTS] defects in order to sell more Subject Nissan Vehicles." (Compl. ¶ 1.) Later, Plaintiffs allege that enterprise members "all served a common purpose: to design, manufacture, distribute, test, and sell Subject Nissan Vehicles equipped with the defective [TCTS] . . ., and thereby maximize the revenue and profitability . . . ." (Id. ¶ 108.) The remaining allegations in the Complaint appear to describe routine business relationship between the various parties where Nissan USA and Nissan Japan designed and manufactured vehicles, including approving designs for the relevant part, (Id. ¶¶ 46, 104), and BorgWarner manufactured and supplied the particular allegedly defective part. (Id. ¶ 110.)

Perhaps the strongest allegation in support of a common purpose is Plaintiffs' assertion that the parties learned of the TCTS defect by 2003 and "shared those results among each other." (Id. ¶ 41.) From this, Plaintiffs infer that the decision to

continue selling Subject Nissan Vehicles with the TCTS instead of remedying the alleged defect suggests that the parties commenced a fraudulent enterprise to sell cars with defective parts at inflated values. Defendants respond, however, that even this interaction reflects parties acting in the ordinary course of business rather than bound by some common purpose. On this point, Defendants direct the Court towards the <u>Falco</u> Plaintiffs' account of the exchanges between Nissan Defendants and BorgWarner regarding the alleged shortcomings of the TCTS.

According to the <u>Falco</u> Complaint, BorgWarner submitted a design for a TCTS that was "validated and approved" by Nissan. (<u>Falco</u> Compl. ¶ 76.) BorgWarner also recommended applying a "countermeasure" to account for wear on the TCTS. (<u>Id.</u>) Based on this recommendation, Nissan's engineering departments directed BorgWarner to investigate potential improvements to the part. (<u>Id.</u>) BorgWarner suggested changes, which Nissan's North American components supported, but apparently "no one anticipated [field] problems" and Nissan Japan concluded that the improvement was neither required nor justified in light of the cost. (<u>Id.</u> ¶ 77.) Of course, as the present Complaint acknowledges, certain design changes were nonetheless made in 2007. (Compl. ¶ 46.) In Nissan's view, these are the actions of independent actors each presenting their own positions and coming to individual conclusions about the best course of action for their businesses.

Defendants also contend that the interactions between NNA and its publicly-traded parent company Nissan Japan are of a routine nature that are insufficient to demonstrate common purpose. Much of the Complaint lumps the action of the Nissan Defendants together

but specific allegations that distinguish between the two units include the assertion that NNA communicated with Nissan Japan regarding the Subject Nissan Vehicles and the TCTS, (<u>Id.</u> ¶ 22,) that NNA transmitted warranty data to Nissan Japan, (<u>Id.</u> ¶ 116,) and a general allegation that NNA and Nissan Japan had a common purpose of selling defective vehicles, (<u>Id.</u> ¶ 108.) Defendants argue that courts have dismissed RICO suits, which offer similarly sparse allegations. <u>See</u> <u>In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litig.</u> (<u>In re Toyota UA</u>), 826 F. Supp. 2d 1180, 1202-03 (C.D. Cal. 2011) (dismissing RICO action where the Complaint "alleges no more than that Defendants' primary business activity—the design, manufacture, and sale or lease of Toyota vehicles—was conducted fraudulently."); <u>see also</u>   <u>In re General Motors LLC Ignition Switch Litig.</u> (<u>In re GM Ignition</u>), 2016 WL 3920353, at *16 (S.D.N.Y. July 15, 2016)(dismissing RICO action because the parties "acted in concert with New GM to carry out its business, and had no common purpose beyond helping New GM carry on its ordinary affairs . . . .")

Plaintiffs respond that the Complaint's allegation that Nissan and BorgWarner shared a common purpose of fraudulently selling defective vehicles is all that is needed to satisfy the requirement of plausibly stating the existence of an enterprise. (Opp'n 6.) Plaintiffs also contend that BorgWarner's decision to continue manufacturing the TCTS despite recommending certain countermeasures does not demonstrate divergent or independent motivations but rather complicity with the enterprise. (<u>Id.</u>) Finally, Plaintiffs dispute Defendants' suggestion that these activities were "routine"

13

1   business transactions. Plaintiffs contend that the cases where RICO

2   Complaints were dismissed involved allegations only of ordinary

3   business transactiond with business partners who unwittingly

4   performed routine services that they would have performed for any

5   other client. See, e.g., In re Countrywide Fin. Corp.

6   Mortgage-Backed Sec. Litig., 2012 WL 10731957, at *10 (C.D. Cal.

7   June 29, 2012) (finding that the cooperation of a firm that

8   provided routine underwriting services was insufficient to prove an

9   enterprise). Here, both supplier and manufacturer allegedly knew of

10  a design defect and continued to produce cars without informing the

11  public. Thus, Plaintiffs contend this case more closely resembles

12  In re Takata Airbag Litig., 2015 WL 9987659, at *1 (S.D. Fla. Dec.

13  2, 2015), where a RICO action was allowed to proceed because the

14  dealerships and manufacturer "knew of a defect in the Takata

15  airbag, knew that Takata had concealed the defect, and defrauded

16  consumers by selling and servicing vehicles for more money than

17  consumers would have paid had the vehicle not contained a defective

18  airbag." (Id.)

19      "When faced with two possible explanations, only one of which

20  can be true and only one of which results in liability, plaintiffs

21  cannot offer allegations that are merely consistent with their

22  favored explanation but are also consistent with the alternative

23  explanation. Something more is needed, such as facts tending to

24  exclude the possibility that the alternative explanation is true,

25  in order to render plaintiffs' allegations plausible." In re

26  Century Aluminum Co. Secs. Litig., 729 F.3d 1104, 1108 (9th Cir.

27  2013) (affirming dismissal because complaint established only a

28  "possible" entitlement to relief). While Plaintiffs repeatedly

state that Nissan and BorgWarner shared a common fraudulent
purpose, they have not adequately alleged plausible facts that
satisfy the common purpose requirement. Rather, the facts alleged
in this action as well as the companion <u>Falco</u> litigation suggest
ordinary business activity on the part of the relevant actors.

Having reviewed similar cases where courts have addressed the
viability of a RICO action, the facts alleged in this case more
closely resemble the suits dismissed in <u>In re Toyota UA</u>, 826 F.
Supp. 2d 1180, and <u>In re GM Ignition</u>, 2016 WL 3920353, than the
suit that survived in <u>In re Takata Airbag</u>, 2015 WL 9987659. The
complaint in <u>In re Toyota UA</u> alleged that Toyota Motor Corporation,
along with its subsidiaries and manufacturers, participated in an
enterprise with the common purpose of "design[ing], build[ing], and
sell[ing] defective Toyota vehicles prone to SUA (sudden unintended
acceleration)." 826 F. Supp. 2d at 1199. Similar to the allegations
in this case, the complaint there generally asserted that the
enterprise participants knew of a product defect but chose to
nonetheless conceal the defect and market the vehicle to
unsuspecting consumers. <u>See id.</u> at 1199-1200. The court in that
case concluded that "Plaintiffs merely allege that the Defendants
are associated in a manner directly related to their own primary
business activities, which is insufficient to state a claim under §
1962(c). Indeed, the SAC alleges no more than that Defendants'
primary business activity—the design, manufacture, and sale or
lease of Toyota vehicles—was conducted fraudulently." <u>Id.</u> at 1202-
03. Likewise, in <u>In re GM Ignition</u>, the court considered
allegations that General Motors, its attorneys, and a claims
administration company "participated in the scheme by knowingly or

15

unknowingly collaborating with New GM to 'fraudulently conceal information about the defects,' and benefited from that purpose by 'secur[ing] ongoing business and income from New GM as a result of achieving settlements for New GM that avoided public disclosure of the Delta Ignition Switch Defect.'" 2016 WL 3920353, at *12. There too the court determined that "Plaintiffs' RICO claim fails because they do not allege a common purpose or organized conduct separate and apart from New GM's ordinary affairs." Id. at *14. In coming to that conclusion, the court noted the conclusory nature of the allegations, the instances where each party appeared to act an independent manner, and the fact that much of the common purpose argument was premised on the ordinary business interactions between the parties. Id. at *14-15.

Similar to the Toyota and General Motors cases, the allegations in this case fail to demonstrate a common purpose, much less a fraudulent one. At best, the allegations here only demonstrate that the parties "are associated in a manner directly related to their own primary business activities." In re Toyota UA, 826 F. Supp. 2d at 1202. Moreover, as the Falco Complaint clarifies, there were several instances where the parties demonstrated they lacked common purpose by reaching independent conclusions. For instance, the manufacturer of the TCTS not only investigated potential shortcomings of the part, it also recommended certain remedial measures. (Falco Compl. ¶ 76.) Unlike a participant in some fraudulent enterprise, these actions seem more consistent with the behavior of a responsive supplier. Indeed, despite assertions of BorgWarner's fraudulent activity and role in a fraudulent enterprise, the company is not named as a defendant in

16

either of Nissan actions. Moreover, there is evidence submitted by Plaintiffs themselves that at least some product improvements were undertaken with regard to the TCTS in 2007, which is inconsistent with the common purpose asserted.

At bottom, both sides seem to agree that the Subject Nissan Vehicles were produced with a part that could have been improved in certain ways. From this starting premise, Plaintiffs conclude that Defendants participated in an enterprise bound by the common purpose of fraudulently selling defective vehicles at inflated prices. Plaintiffs correctly note that similar fact patterns in the context of defect vehicle parts have led to viable RICO claims. But in cases such as In re Takata Airbag Litigation, the complaint included "pages of references to specific communications" showing the defendants "acting as an enterprise" and "engaged in a collaborative scheme to defraud." 2015 WL 9987659, at *1-2. Here, however, Plaintiffs have not given us any specific facts that move their allegations from the realm of the possible to the plausible.

In the ordinary course, "a district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts." Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995). Here, however, the court finds that Plaintiffs will be unable to plead additional facts to cure the deficiency identified. Both parties have urged the court to take notice of the Complaint in the Falco litigation in order to make their arguments regarding the instant motion. (See supra at 6 n.1.) Plaintiffs in particular contend that Falco Complaint "provides details of the 'who, what, when, and where' . . . sufficient to meet Plaintiffs' burden at the pleading stage."

1    (Opp'n 16-17.) Having had the benefit of reviewing not only the

2    allegations in this Complaint, but also the allegations in the

3    third iteration of the companion case complaint, the court cannot

4    identify what additional facts Plaintiffs might plausibly allege to

5    demonstrate the existence of an enterprise bound by a common

6    purpose. Accordingly, the court DISMISSES the Complaint for failure

7    to plausibly allege the existence of an enterprise.

8            **C. Conspiracy to Violate RICO**

9            Plaintiffs also raise a claim for conspiracy to violate §

10   1962(c) under § 1962(d). To be liable under 18 U.S.C. § 1962(d), a

11   "conspirator must intend to further an endeavor which, if

12   completed, would satisfy all the elements of the substantive

13   criminal offense." <u>Howard v. America Online</u>, 208 F.3d 741, 751 (9th

14   Cir. 2000). Because Plaintiffs have failed to state a claim for a

15   violation of RICO under § 1962(c), and because there were no

16   independent allegations in support of a conspiracy claim, the court

17   concludes that the conspiracy claim must also fail.

18   **IV. CONCLUSION**

19           For the reasons set forth above, Defendants' Motion to Dismiss

20   is GRANTED. The Complaint is dismissed without leave to amend.

21

22   IT IS SO ORDERED.

23

24

25   Dated: October 24, 2016

26                                        DEAN D. PREGERSON
                                          United States District Judge

27

28